*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

KELLY MARIE BARNES,

Defendant-Appellant.

UNPUBLISHED
February 10, 2025
9:49 AM

No. 368949
Ionia Circuit Court
LC No. 2023-018708-FH

Before: BOONSTRA, P.J., and K. F. KELLY and YOUNG, JJ.

PER CURIAM.

Defendant, Kelly Marie Barnes, appeals as of right her September 7, 2023 convictions for Carrying a Concealed Weapon, MCL 750.227 and Resisting or Obstructing a Police Officer, MCL 750.81d(1). Barnes argues that: (1) the prosecutor engaged in misconduct by referencing the outstanding warrant for defense witness Amy Cornwell at trial and because the defense failed to object, Barnes received ineffective assistance of counsel; and (2) that the sentences imposed were both unreasonable and disproportionate. As such, Barnes requests that this Court vacate her convictions or remand for resentencing. We affirm her convictions and sentences.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of the December 10, 2022 traffic stop of Barnes conducted around 11:31 p.m. by Belding Police Officer Jayson Tobar. At trial, Tobar testified that he was parked at the "C–Store," at the site of an old Marathon gas station, when he observed a white Malibu's failure to come to a stop before entering a public roadway. Tobar then observed the Malibu "run[] right through the intersection and park[] into the parking lot of Wesco. A few minutes later, Tobar testified, he saw a silver Silverado pull up to the side of the Malibu, when a male driver exited the Silverado and approached the Malibu. Tobar identified the driver of the Silverado as Daniel Armstrong, and the driver of the Malibu as Barnes, due to having previous interactions with both individuals. After Armstrong and Barnes' brief interaction, Armstrong got back into his vehicle, and both vehicles drove away. Tobar testified that he then observed (1) the Malibu exiting onto South Pleasant Street without coming to a complete stop before entering the public roadway; (2) the Malibu turning right onto M-44 from Pleasant Street without making a complete stop at the

-1-

stop light; and (3) that the Malibu did not activate brake lights during either of these exits/turns. Tobar pulled the Malibu over. In addition to Barnes, the Malibu also had passenger Amy Cornwell.

Tobar testified that he shined his flashlight on Barnes as he approached the vehicle because Barnes was looking through her purse. Because Tobar believed that the Malibu's windows were not operating, he opened the door. Barnes said, "Hey, Tobar" and Tobar responded, "Hey, Kelly. How you doing?" Barnes handed Tobar her driver's license and continued to look through her purse for her insurance and registration. She was hunched over her purse as she looked through it. While Barnes searched her purse, Tobar asked Cornwell for her driver's license. Barnes told Cornwell that she didn't have to provide Tobar with her license. Tobar agreed, stating, "[y]ou're right. She doesn't have to, but I like to know who I'm talking to." Tobar testified that while Barnes was looking through her purse, he saw a "black backstrap, what appear[ed] to be a part of a gun." He then asked Barnes whether she had a gun, and testified that Barnes immediately concealed the gun by putting her body over her purse. At that point, Tobar instructed Barnes to raise her hands, and said, "let me see your purse." Tobar tried "snatching" her purse. He testified:

> Q: Did you give her any commands at this time?
>
> A: Yes. I told her, "Let me see your hands. Put 'em up where I can see 'em." She doesn't listen. She's not listening to me. I'm like, okay. I'm trying to grab the handgun from her for my safety and her safety, trying to pull that away from her. I was like, "Let me see your purse" and she's — she keeps tugging away. I'm, okay, try — I try grabbing her out of the vehicle, grabbing her wrist, and try pulling her out.
>
> Q: What did she do then?
>
> A: She keeps pulling away, breaks the grip from my hand from her wrist. I'm like, "Kelly, you need to get out of the vehicle right now," and she's not listening to me, so I was, okay, and I try snatching the purse from her again, and she doesn't listen. She keeps concealing the purse with her body. And at this time, we're going through a scuffle, like we're trying to I'm trying to rip that purse away from her because I want to know what's in that purse. Now, she's like pulling it with all her life. So then throughout that time, she just, "Okay. Here," throws me a pistol. She's just, "Here." I'm like, okay. I grab the pistol, and I put it on the roof. I put it on the roof of the vehicle.
>
> Q: And then did you give her any commands after that?
>
> A: Yes. I still asked her, "Okay. I need you to step out of the vehicle."
>
> Q: Did she comply with that command?
>
> A: No.
>
> Q: Approximately how many times did you ask for her to step out of the vehicle?

*A*: More than three, four times.

Barnes admitted that the gun belonged to her and stated that "[she] forgot to take that out of [her] purse." According to Tobar, Barnes told there were not any rounds in the chamber of the pistol. When Tobar asked Barnes if she had a "CPL," she responded "what is that?" Tobar confirmed that Barnes did not have a CPL, though the gun was registered to Barnes. When Tobar searched Barnes' purse, he also discovered two loaded magazines for the pistol. Tobar searched the rest of the vehicle and discovered a floral handbag under the drivers' seat, which contained a round of ammunition that matched the other rounds. Tobar let passenger Cornwell drive Barnes' Malibu home that night following the search.

On cross-examination, Tobar said he had a "hunch" that Barnes and Armstrong met up for a drug deal, but he was unsure if any transaction had actually taken place. Defense counsel played the body camera footage for the jury, and asked Tobar if he ever actually requested Barnes' documentation after initiating the stop, pointing out that no such request was heard in the video. Tobar replied, "if it's not on the video, it didn't happen, I guess." Tobar confirmed that he had not informed Barnes of the reason for the traffic stop until 33 minutes and 5 seconds into the stop. Tobar further testified during cross-examination:

> *Q*: The passenger of this vehicle was Amy Cornwell; is that correct?
>
> *A*: That's correct.
>
> *Q*: Okay. And she had no warrants out for her arrest?
>
> *A*: She did, actually.
>
> *Q*: Okay. But no one came to pick her up?
>
> *A*: No.
>
> *Q*: And you did not see Amy Cornwell interact with this [Armstrong] character; is that correct?
>
> *A*: I don't know. When I asked her, she just said that she was on her phone.
>
> * * *
>
> *Q*: And you did not suspect Amy Cornwell of committing a crime, did you?
>
> *A*: No.

Cornwell testified at trial that she grew up with Barnes, and that on the night of Barnes' arrest, Cornwell had been helping Barnes with her computers at Barnes' house in Belding. Cornwell testified that Barnes is a good driver, who drove "a little slow," and that Barnes had in fact come to a complete stop at each of the three times at issue, contrary to Tobar's testimony that she did not. Cornwell described Tobar's demeanor towards her that night as "a little aggressive" and that he "wasn't very friendly at all."

Barnes also testified on her own behalf at trial. She said that when Tobar stopped her, she was not informed of the reason for the stop which made her a little anxious. Barnes said she already had her driver's license ready because Tobar had pulled her over, but that her insurance and other documents were on her phone and not in her purse. As to how the pistol came to be in her purse without her knowledge of it, Barnes testified that she could not get her gun safe open, so she placed her gun in her purse and forgot about it.

Barnes said she did not see the pistol in her purse when she was searching for her registration and insurance information, so she did not know how Tobar would have been able to see it. She only became aware of the gun when Tobar asked her about it. Barnes said she typically carried her gun in the case that it came in when she purchased it. When traveling with the gun, Barnes would put in in the trunk of the car.

During closing arguments, defense counsel argued that Tobar did not have a reason to conduct a traffic stop because he could not have seen the rolling stops from his vantage point. Defense counsel also asserted that Tobar unlawfully searched Barnes' purse when he conducted the traffic stop, and argued in closing, "now we're back in the time of the king of England." He also argued that Tobar could not have seen the gun in Barnes' purse from where he was standing, and that therefore, the commands he gave her to exit the car were not lawful.

In reply, the prosecution argued in closing:

[Defense counsel] wants to paint Officer Tobar as a Wild West no rules police officer. Officer Tobar was doing his duty. He saw the traffic infractions. He made a lawful stop. Nothing he did was unlawful. Defense wants to paint him as being aggressive. That's what Amy Cornwell said, saw him being aggressive. Watch the video. I encourage you to watch the video. Officer Tobar is being respectful and gives Kelly and Amy the respect that anybody deserves, treated them with courtesy, put Kelly in the patrol vehicle with the heat on, cold outside. He let Amy, who was wanted out of Lansing, let Amy drive the car home so she could get home. He's treating them with respect and courtesy. He's not acting unlawful. He's not being aggressive.

Defense counsel did not object to the prosecution's closing argument. After the trial court instructed the jury and released them to deliberate, the following exchange occurred between the trial court and both attorneys:

*The Court*: So anything as it relates to instructions or closing arguments? I'll start with the People. Mr. Franklin?

*Defense counsel*: No, your honor.

*The Court*: Nothing? You look pained?

*Defense counsel*: Well, I'm conflicted. Typically, out of habit, I would make a motion for a directed verdict, but—

*The Court*: Well, we're way past that.

-4-

*Defense counsel*: I don't think there's a legal issue here that I want to discuss, but I think it's just—

*The Court*: All right. So let the Court, then—you're all set then?

*Defense counsel*: Yes, your Honor.

*The Court*: All right. So, I don't know, and I don't believe it's the Court's responsibility; however, I do not believe that there was any evidence in this trial relating to witness Cornwell having a warrant for her arrest. I didn't hear anything about that, and nothing in the trial was highlighted of that nature, but yet, Mr. Mrzlack, in his rebuttal, when Mr. Franklin couldn't respond to it—

\* \* \*

*The Court*: But yet, Mr. Mrzlack, in your rebuttal, mentioned something of that nature.

*Prosecutor*: I said she was wanted out of Lansing because—

*The Court*: Yeah.

*Prosecutor*: —in the video, which Defense didn't object to showing, there is, on the radio, clear communication that the—the—Ms. Cornwell has a bench warrant. There's a warrant out of Lansing. I asked the witness, Officer Tobar, "[t]hat's about the passenger?" He said "Yes. They are talking about the passenger."

*The Court*: So I think that is right up the alley of where the Court's going with this. So I don't recall that being highlighted at all in this trial. That seems a bit deceptive to the Court, and especially to do it in rebuttal where it can't be responded to. So now, frankly, the Defendant didn't object to the same. I'm bringing it to my attention because, in my opinion, it's a bit of underhanded— what's the word I'm searching for? —deceptive way of trying a case. And the only reason I say that is because the People, the People, should be above reproach. It is the role of defense attorney to be master to his client. In fact, the unique thing about being defense counsel is they don't have any ethical obligation to anybody but their client. Their ethical obligation isn't even to the truth, frankly, which is unfortunate. However, that's not the same case with the People, and I—I for the life of me, don't know why that was brought into a rebuttal closing argument or even anything to do with the trial. This trial is not going to be won or lost based on the fact that Ms. Cornwell may have had a warrant out of another jurisdiction. So I found that troubling. I frankly, was waiting for Mr. Franklin to jump up and interrupt your rebuttal and object to it, because the appropriate objection might have been to request a mistrial. But that didn't happen. I'm placing it on the record, and then any appellate court that wants to review the same is welcome to.

-5-

Thereafter, the jury convicted Barnes of both counts as charged: Count 1, Carrying a Concealed Weapon, in violation of MCL 750.227 and Count 2, Resisting or Obstructing a police officer, in violation of MCL 750.81d(1). Barnes' sentencing guidelines were calculated at 0 to 11 months. The trial court sentenced Barnes to 120 days in the Ionia County jail, and a two-year term of probation. One of Barnes' probation conditions was that she had a nightly curfew from 10:00 p.m. until 6:00 a.m., unless she had the approval of her field agent. This appeal followed.

## II. ANALYSIS

### A. BARNES' RIGHT TO A FAIR TRIAL AND RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

Barnes argues that the prosecutor's reference during closing argument to Cornwell's outstanding warrant constituted misconduct affecting Barnes' due process right to a fair trial. In the alternative, Barnes argues that defense counsel's failure to object to the prosecutor's comment during closing argument rendered defense counsel ineffective. We find no merit in either of Barnes' arguments.

### 1. ISSUE PRESERVATION AND STANDARDS OF REVIEW

"For an issue to be preserved for appellate review, it must be raised, addressed, and decided by the lower court." *People v Anderson*, 341 Mich App 272, 279; 989 NW2d 832 (2022) (citation omitted). Barnes made no objection at trial regarding any violation of her due process rights, or prosecutorial misconduct. Therefore, the issues are unpreserved. We review unpreserved error on appeal for plain error affecting the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). This requires the defendant to show that the plain error affected the outcome of the proceedings. *Id*. Reversal is warranted only if the error resulted in the conviction of an innocent defendant or seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Id*. No error requiring reversal will be found if the prejudicial effect of the prosecutor's comments could have been cured by a timely instruction. *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001).

Issues of prosecutorial misconduct are reviewed de novo to determine whether the defendant was denied a fair and impartial trial. *People v Akins*, 259 Mich App 545, 562; 675 NW2d 863 (2003). Allegations of prosecutorial misconduct are considered on a case-by-case basis, and the reviewing court must consider the prosecutor's remarks in context. *Id*.

### 2. BARNES FAILS TO ESTABLISH ANY VIOLATION OF HER RIGHT TO A FAIR TRIAL

Claims of prosecutorial misconduct are reviewed on a case-by-case basis. *People v Kelly*, 231 Mich App 627, 637; 588 NW2d 480 (1998). "The propriety of a prosecutor's remarks depends on all the facts of the case." *People v Rodriguez*, 251 Mich App 10, 30; 650 NW2d 96 (2002). A prosecutor's comments are to be evaluated in light of defense arguments and the relationship the comments bear to the evidence admitted at trial. *People v Brown*, 267 Mich App 141, 152; 703 NW2d 230 (2005). The prosecution cannot argue facts or evidence not admitted as evidence at trial. *People v Stanaway*, 446 Mich 643, 686; 521 NW2d 557 (1994). "[A]n otherwise improper remark may not rise to an error requiring reversal when the prosecutor is responding to the defense

counsel's argument." *People v Watson*, 245 Mich App 572, 593; 629 NW2d 411 (2001) citing *People v Kennebrew*, 220 Mich App 601, 608; 560 NW2d 354 (1996).

The trial court here incorrectly stated after closing arguments, when expressing distaste for the prosecution's reference to the warrant, that there "was[n't] any evidence in this trial relating to witness Cornwell having a warrant for her arrest. First, there was a reference to the warrant heard on the body cam footage played to the jury with no objection. Second, during Tobar's testimony, he stated:

> *Q*: The passenger of this vehicle was Amy Cornwell; is that correct?
>
> *A*: That's correct.
>
> *Q*: Okay. And she had no warrants out for her arrest?
>
> *A*: She did, actually.
>
> *Q*: Okay. But no one came to pick her up?
>
> *A*: No.

Given these references during trial to Cornwell's warrant, the remark made during closing did in fact reference evidence that was already admitted at trial. Defense counsel specifically asked about the warrant during Tobar's cross examination, thus opening the door for rebuttal on this point by the prosecution.

Further, considering the brevity of the reference to the warrant in closing, and that the warrant had been previously mentioned with no objection earlier in the case, as well as considering the evidence presented at trial supporting the verdict and sentence in this case, it cannot be said that Barnes met her burden in demonstrating error that seriously affected the fairness, integrity, or public reputation of the trial proceedings.

Barnes next argues that defense counsel's failure to object to the aforementioned comment regarding the warrant rendered counsel ineffective. This too lacks merit. Defendants have a constitutional right to the assistance of counsel for their defense in all criminal prosecutions. See US Const, Am VI; Const of 1963, Art. 1, § 20. "An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair. For that reason, the Court has recognized that the right to counsel is the right to the effective assistance of counsel." *Strickland v Washington*, 466 US 668, 685-686; 104 S Ct 2052; 80 L Ed 2d 674 (1984) (citation and quotation marks omitted). To establish that defense counsel was ineffective, defendant must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Id*. at 687. Because both prongs must be satisfied to establish ineffective assistance of counsel, if a defendant cannot satisfy one prong, the other need not be considered. *Id*. at 697. "In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012).

Barnes alleges deficient performance by trial counsel premised on his failure to object to the prosecutor's rebuttal during closing argument that referenced Cornwell's warrant. Here, as reasoned above, defense counsel's failure to object at closing was not legally deficient considering that the evidence had already been presented multiple times at trial, via Tobar's testimony and video evidence played for the jury. Barnes cannot meet the first prong of the test. In her brief on appeal, Barnes does not mention the second prong of the *Strickland* analysis. Because Barnes fails to meet both prongs of the *Strickland* test, she fails to establish that she received ineffective assistance of counsel at trial, and is not entitled to relief on this issue.

## B. PROPORTIONALITY AND REASONABLENESS OF BARNES' PROBATION SENTENCE

Barnes argues that her sentence of a 2-year probation term is both unreasonable and disproportionate. At oral argument, the prosecutor pointed out that Ms. Barnes had been discharged from probation for several months at that point, mooting any issue with her sentence. We agree and decline to review this issue. *People v Rutherford*, 208 Mich App 198, 204; 526 NW2d 620 (1994).

## III. CONCLUSION

We find no plain error occurred when the prosecutor referenced Cornwell's outstanding warrant in closing argument and defense counsel failed to object. Moreover, we find that Barnes failed to meet her burden in establishing that she received ineffective assistance of counsel at trial. We further find any issues raised as to Barnes' sentence moot.

Affirmed.

/s/ Mark T. Boonstra
/s/ Kirsten Frank Kelly
/s/ Adrienne N. Young